

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00099-CV

_____

CONSTANTINO MEZA, PLUTARCO MEZA, DANIELA MEZA AND
ALEJANDRA MEZA, Appellants

V.

THE CITY OF FORT WORTH, TEXAS, Appellee

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-317204-20

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Appellants Constantino Meza and his children Plutarco Meza, Daniela Meza, and Alejandra Meza appeal from the trial court's order granting the motion to dismiss for lack of jurisdiction filed by Appellee the City of Fort Worth. The Mezas sued the City after Constantino was injured and his wife Guadencia Meza—Plutarco, Daniela, and Alejandra's mother—was killed when a speeding pickup truck struck their vehicle. The driver of that truck, Luis Young III, had fled a traffic stop and was being pursued by a City police officer. In three issues, the Mezas argue that the trial court erred by granting the City's plea to the jurisdiction because the City's police officer's conduct waived immunity for the claims, the City had the notice required under the Texas Tort Claims Act (TTCA), and a fact issue exists about whether the pursuit and failure to comply with police-department policies were a cause of the accident. Because the City did not have notice of the Mezas' claims, we affirm.

### Background

In September 2018, Fort Worth Police Officer Benjamin Wright stopped a white Ford F-150 on Terminal Road after the truck ran a red light. Wright had been following the truck since it had left a convenience store a few minutes before because he believed that a woman named Selena Monrreal was a passenger. Monrreal had been reported by an apartment-complex employee for burglarizing vehicles in the complex's parking lot, and information from witnesses led Wright to believe that Monrreal had left the complex in the truck.

After stopping the truck, Wright approached to speak to its driver.[1] When the driver opened the door, Wright could smell a marijuana odor coming from inside. Wright immediately recognized the driver as Young because of Young's distinctive face tattoos.[2] Wright had recently seen Young's picture while working on a stolen-and-recovered-vehicle case in which the vehicle's owner had blamed Young for the theft.[3] When Wright told Young that he recognized him, Young shut the door and drove away. Wright ran back to his vehicle while radioing dispatch that the truck had fled a traffic stop, that the truck's occupants were burglary suspects, and that he thought the driver's name was "Luis something"; in the moment, he forgot Young's last name. Wright did not convey over the radio that Young was previously known to him. Wright was unable to follow Young because of traffic, but he saw Young speeding down the wrong side of Terminal Road and turning southbound onto North Main by driving the wrong way on a North Main-to-Terminal exit ramp. By the time Wright reached North Main, he had lost sight of the truck.

Meanwhile, Fort Worth Police Sergeant Martin Chazarreta was nearby, driving southbound on North Main, when he heard Wright's radio call about the fleeing truck.

---

[1]Police later determined that the truck was stolen, but Wright did not have that information at the time of the stop.

[2]Young's nickname was "Baby Joker."

[3]Fort Worth police also suspected Young of burglarizing a shed.

Chazarreta almost immediately saw a white Ford F-150 speed on Terminal toward North Main and then turn onto North Main by driving the wrong way on the exit ramp. The truck continued driving southbound on North Main at a high speed. After Chazarreta radioed dispatch that he had the truck in sight and that the truck had three people in it, he heard Wright state that one of the occupants was possibly a burglary suspect. Chazarreta did not follow up with Wright to ask if Wright knew more about Young's identity or how to find him later. But because of Young's driving and Chazarreta's assumption that "burglary suspect" meant a felony-burglary suspect,[4] Chazarreta decided that the need to stop Young outweighed any risks posed by a pursuit. Accordingly, he turned on his lights and siren and tried to catch up to the truck, which was driving at speeds over 90 mph. Young ran another red light, which Chazarreta slowed down to proceed through. Chazarreta remained one to two blocks behind the truck and never managed to close the distance between them; by the time Chazarreta went through the intersection at 28th Street—several blocks away from Exchange Avenue, where Young would ultimately crash—the truck "was pulling away" from him.

---

[4]Not all burglaries are felonies. For example, burglary of a vehicle is a Class A misdemeanor. Tex. Penal Code Ann. § 30.04.

The pursuit did not last long, ending after approximately 1.8 miles and 72 seconds,[5] when Young reached the Exchange Avenue intersection and rear-ended the Mezas' Jeep, which was stopped there at a red light. The crash injured Constantino Meza and killed Guadencia Meza. During the pursuit, Chazarreta drove at an average speed of 91 mph[6]; the pursuit began on a part of North Main with a 40-mph speed limit, and the area where the crash occurred—a tourist area—had a 30-mph limit.

At the time of the pursuit, the department's general orders, which contain department policies and procedures, stated that a vehicle pursuit was justified "when a suspect exhibits the intent to avoid apprehension by refusing to stop when properly directed to do so" or if the officer reasonably believed "that the suspect, if allowed to flee, would present a danger to human life or cause serious injury." An officer was not to begin any pursuit that would "create a greater harm to innocent bystanders or property than is warranted." In deciding whether to pursue a vehicle, an officer needed to consider "[p]opulation density," "vehicle and pedestrian traffic," the "[s]eriousness of the offense," the "[p]resence of other persons in the suspect's vehicle," and "[w]hether or not the offender's identity is known." Officers were required to end the

---

[5]Driving down North Main, Young and Chazaretta passed the cross-streets of 38th Street, 37th Street, 36th Street, 35th Street, 34th Street, Long Avenue, 32nd Street, 31st Street, 30th Street, 29th Street, 28th Street, 27th Street, Stockyards Boulevard, and 25th Street before reaching Exchange.

[6]The Mezas' expert calculated that at times Chazaretta was driving over 100 mph.

pursuit if the suspect's vehicle began driving against traffic or "if the suspect's identity ha[d] been determined and apprehension at a later date [wa]s feasible."

After the incident, the department approved revisions to the pursuit policy. Under the policy before the incident and as revised, a supervisor must write an administrative pursuit report after any vehicle pursuit and forward that report to the chain of command for review. In this case, the chain-of-command officers who reviewed the report determined that the pursuit complied with department policy. Then-Deputy Chief (now Assistant Chief) Robert Alldredge Jr. further concluded that the crash would have happened even if Chazarreta had terminated the pursuit at 28th Street.[7]

The Mezas sued Young and the City in June 2020 asserting that the defendants' negligence had caused the crash and the Mezas' resulting injuries. The Mezas further alleged that they had complied with any TTCA presuit claim-notification requirements and that the City had actual notice of the Mezas' claims. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.101(a), (c), 101.021. The City moved to dismiss for lack of jurisdiction asserting, among other grounds, that the City had no statutory or actual notice of the Mezas' claims as required by TTCA Section 101.101.

---

[7]Alldredge did not explain why he mentioned 28th Street specifically, but it is around that intersection that the speed limit reduces to 30 mph.

6

The Mezas filed a response but did not produce any evidence that they had provided the City with the formal statutory notice required by TTCA Section 101.101(a). *See id.* Instead, the Mezas argued that the police department's crash investigation gave the City actual notice under Section 101.101(c). The trial court granted the City's motion and dismissed the Mezas' claims against the City with prejudice, and the Mezas now appeal. *See id.* § 51.014(a)(8) (allowing interlocutory appeal from ruling on plea to jurisdiction); *Kosoco, Inc. v. Metro. Transit Auth. of Harris Cnty.*, No. 01-14-00515-CV, 2015 WL 4966880, at *3 (Tex. App.—Houston [1st Dist.] Aug. 20, 2015, no pet.) (mem. op.) (noting that a motion to dismiss for lack of jurisdiction is the functional equivalent of a plea to jurisdiction).

**Standard of Review**

We review a ruling on a plea to the jurisdiction de novo. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 512 (Tex. 2019). "A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both." *Alamo Heights I.S.D. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). In reviewing a jurisdictional plea challenging the pleadings, we determine if the plaintiff has alleged facts affirmatively demonstrating subject-matter jurisdiction. *Id.* If, on the other hand, the plea challenges the existence of jurisdictional facts, we consider evidence as necessary to resolve the jurisdictional issues. *Id.* If the evidence raises a jurisdictional fact issue that is intertwined with the merits, the trial court cannot grant the plea. *Worsdale v. City of Killeen*, 578 S.W.3d 57, 66 (Tex. 2019). In determining whether a fact issue exists, we must take as true all

7

evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Clark*, 544 S.W.3d at 771. "In doing so, however, we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not." *Id.*

## Discussion

The Mezas' motion-to-dismiss response relied on the immunity waiver in TTCA Section 101.021. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021. Accordingly, the Mezas had to satisfy Section 101.101's notice requirement. The Mezas assert in their second issue that the trial court erred by granting the City's plea to the jurisdiction because the City did have the required notice. We focus on this issue, which is dispositive.

## I. TTCA's Notice Requirement

To maintain a claim against a governmental unit[8] under the TTCA, the claimant must first provide the unit with notice of the claim, and that notice must be given "not later than six months after the day that the incident giving rise to the claim occurred." *Id.* § 101.101(a); *Reyes v. Jefferson Cnty.*, 601 S.W.3d 795, 798 (Tex. 2020). This formal notice must reasonably describe the incident in question, the time and place of its occurrence, and the resulting damage or injury. Tex. Civ. Prac. & Rem. Code Ann.

---

[8]The City is a governmental unit under the TTCA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.001(3).

8

§ 101.101(a). But no formal notice is required if the government "has actual notice that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged." *Id.* § 101.101(c).

When a person provides formal notice, the government learns that it is or may be responsible for the person's injury or property damage and that it might have to defend against a claim arising from that injury or damage. *Id.* § 101.101(a). Having this information allows the government to gather information in order to guard against unfounded claims, to settle claims, and, if necessary, to prepare for trial. *Worsdale*, 578 S.W.3d at 63 (citing *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995)). It further enables the government to protect the public by correcting any condition or policy that contributed to the incident. *Id.* at 59. For the government to have actual notice under Subsection (c), it must have that same knowledge that it would have had if the plaintiff had provided formal notice under Subsection (a): the basic details about the incident *and* knowledge of the government's alleged fault, in the same manner as ultimately alleged by the plaintiff, in producing or contributing to the incident. *Id.* at 63–64; *City of San Antonio v. Tenorio*, 543 S.W.3d 772, 776 (Tex. 2018). And, as with formal notice, it must develop that knowledge within six months of the incident. *Reyes*, 601 S.W.3d at 796 (citing Tex. Civ. Prac. & Rem. Code Ann. § 101.101).

"Fault" in this circumstance means responsibility for the claimed injury, but it is not synonymous with legal liability. *Univ. of Tex. Sw. Med. Ctr. at Dall. v. Est. of Arancibia ex rel. Vasquez-Arancibia*, 324 S.W.3d 544, 550 (Tex. 2010). So, for example, when a

9

government hospital concluded that its employee doctor did not breach the standard of care and was therefore not negligent in providing medical care to a patient, but it also recognized that the doctor's providing that care resulted in the patient's death, the government had sufficient awareness of fault regarding the death. *Id.*; *see Worsdale*, 578 S.W.3d at 68, 70 (stating that "[t]he critical inquiry is the governmental unit's actual anticipation of an alleged claim rather than subjective confirmation of its actual liability" and that actual notice thus requires information sufficient to "alert the governmental unit to something impending"); *Reyes*, 601 S.W.3d at 798 ("The actual-notice standard does not require proof that the County *believed* it was liable." (cleaned up)). "Whether a governmental unit has actual notice is a fact question when the evidence is disputed, but it is a question of law when the evidence is undisputed." *Tenorio*, 543 S.W.3d at 776.

A court will not conclude that the government knew that it was at fault or knew that the plaintiff believed it to be—knowledge that courts refer to as having subjective awareness of fault—from evidence that shows only that the government knew that the incident had occurred. "Many governmental units may, in the ordinary course of events, have knowledge of injuries but no warning—'notice'—that a lawsuit might eventually be filed alleging the governmental unit was responsible in some way, shape, or form." *City of Dallas v. Mazzaro*, No. 05-20-00103-CV, 2020 WL 6866570, at *5 (Tex. App.—Dallas Nov. 23, 2020, no pet.) (mem. op.) (cleaned up) (quoting *Worsdale*, 578 S.W.3d at 72). Nor is subjective awareness shown with evidence that the government investigated the incident and uncovered information that, to an outside observer,

indicates that the government was at fault: "It is not enough that a governmental unit should have investigated an incident as a prudent person would have, or that it did investigate, perhaps as part of routine safety procedures, or that it should have known from the investigation it conducted that it might have been at fault." *Tex. Dep't of Crim. Just. v. Simons*, 140 S.W.3d 338, 347–48 (Tex. 2004). That is, "the proper inquiry is not whether the City *should have* made the connection between [the plaintiff's] injury and [the City's] responsibility as alleged, but whether the City made the connection or had knowledge that the connection had been made." *City of Houston v. Miller*, No. 01-19-00450-CV, 2019 WL 7341666, at *6 (Tex. App.—Houston [1st Dist.] Dec. 31, 2019, no pet.) (mem. op.) (quoting *Worsdale*, 578 S.W.3d at 66). If the government does not have that specific knowledge, the government does not have subjective awareness of fault and therefore does not have actual notice to satisfy Section 101.101(c). *See Ortegren v. City of Denton*, No. 2-05-177-CV, 2006 WL 495387, at *5 (Tex. App.—Fort Worth Mar. 2, 2006, pet. denied) (mem. op.) (holding no actual notice of plaintiff's claim that drop-off next to road had caused car accident despite county official's investigating accident and concluding that drop-off was a hazard that should be ameliorated because evidence showed that investigator did not believe drop-off caused the accident).

Examples of when the government "made the connection or had knowledge that the connection had been made" are seen in *Reyes* and *Worsdale*. In *Reyes*, Reyes's attorney's correspondence with the county's claims administrator provided the basic details about an incident—what incident occurred on what date, who was involved, and

11

that injury resulted—and expressed the attorney's desire to work with the administrator toward "a quick and amicable resolution of this claim." *Reyes*, 601 S.W.3d at 796. The administrator then acknowledged, investigated, and denied Reyes's claim. *Id.* at 798. The county had all the information to which it would have been entitled from formal notice, including the fact that Reyes was claiming that the county was at fault in the manner he later alleged in his lawsuit. *Id.*

Similarly, in *Worsdale*, the city's own investigation gave it the same knowledge that formal notice would have imparted. *Worsdale* involved a suit alleging that a city road's conditions had caused a motorcycle accident that resulted in two deaths. 578 S.W.3d at 60. The jurisdictional evidence showed that within days of the accident, the city had investigated, concluded that road conditions had contributed to the accident, and—crucially—determined that the road's maintenance had been the city's responsibility. *Id.* at 66–67. Accordingly, from the city's investigation, it knew that its own failure to maintain the road had contributed to the motorcyclists' deaths. *Id.* at 59.

As these two cases demonstrate, when the government has subjective knowledge of its fault in the same manner alleged by the plaintiff—either because the plaintiff had made an allegation of fault against the government within the requisite time frame or because the government itself recognized its fault—formal notice is superfluous. *See, e.g.*, *Arancibia*, 324 S.W.3d at 550.

12

## II. The Mezas' Allegation of Fault

The City produced affidavit evidence that it had not received formal notice of the Mezas' claims until it received the petition more than 21 months after the incident, and the Mezas presented no evidence to dispute this fact. Consequently, the trial court has jurisdiction over the Mezas' suit only if the City learned on its own of its potential fault.[9]

We conduct our actual-notice analysis by first discerning what the Mezas alleged the City's fault to be in causing the crash and then considering whether the jurisdictional evidence indicates that the City knew it was potentially at fault in the manner alleged by the Mezas. The Mezas' claims against the City are all based on the premise that the crash occurred, at least in part, because Chazarreta initiated and continued the pursuit. First, they alleged that the crash would not have occurred but for Young's *and* Chazarreta's reckless driving. Then—because regardless of how he was driving, Chazarreta did not actually hit the Mezas' Jeep and was still several blocks from the intersection at the time of the crash—they linked his driving to the crash by pleading that his pursuit had caused Young to drive recklessly toward their vehicle. They specifically alleged that Young

---

[9]Because "[n]otice can be imputed to the City by an agent or representative who has a duty to gather facts and investigate," we assume for this opinion that if the police-department officers who reviewed the pursuit or investigated the crash had sufficient awareness of fault, so too did the City. *See City of Houston v. McGowen*, No. 14-13-00415-CV, 2014 WL 2039856, at *7 (Tex. App.—Houston [14th Dist.] May 15, 2014, no pet.) (mem. op.).

"was not a danger to society at large until he fled the scene of the *traffic stop* and was chased into a crowded tourist destination by [Chazarreta] at ridiculously high speeds (approaching 100 mph)." They further contended that because Wright knew Young's identity, Chazarreta violated the department's policy by not terminating the pursuit. And they pleaded that the City "was also negligent for failing to implement and enforce proper policies and procedures for high-speed pursuit and failing to properly train and supervise its officers in connection with such chases."

Based on these allegations, we look to the record to see if the City knew that Chazarreta's pursuing Young potentially put it at fault for the crash. We consider the relevant documents attached to the City's dismissal motion, including affidavits from Chazarreta, Wright, and Alldredge, as well as the police department's vehicle-pursuit report regarding the incident. We also consider the Mezas' response evidence, which included the police department's crash report; an incident-detail report; the department's pursuit policies at the time of the incident and as later revised; deposition testimony from Wright, Chazarreta, and Alldredge; and an expert affidavit.

## III.  The Relevant Evidence

In Alldredge's affidavit, he stated, "Neither I, nor any other officer down my chain of command, ever believed—or indicated to me a belief—that any member of the Fort Worth Police Department did something wrong with regard to the pursuit of Luis Young III or that the Department might in any way have been at fault for Young's collision." In his deposition, Alldredge acknowledged that when the pursuit occurred,

14

the department's pursuit policy stated that whether the offender's identity is known is a factor an officer must consider in deciding whether to start a pursuit and that "[a] pursuit shall be terminated if the suspect's identity has been determined and apprehension at a later date is feasible." Alldredge acknowledged that Wright had failed to communicate to Chazarreta that he knew Young's full name and identity. But Alldredge also stated that he believed the pursuit might have happened even if Wright had done so because of how Young was driving. Chazarreta's deposition testimony supported Alldredge's opinion: he stated that although his decision to pursue Young might have been different if he had known that Wright knew Young's identity, he could not say one way or the other. He further explained, "But I was also concerned of the speed [that Young] was going. He's now a danger to everybody on the road. . . . I just wanted him to stop."

The pursuit report contained the findings of Alldredge, Commander Pedro Criado, and other chain-of-command officers. Each officer in the chain of command determined that the pursuit was justified and within the department's policy. Criado stated that he agreed with the others that the pursuit was "lawful and within the realms of our pursuit policy," but he believed "that this is a good opportunity to debrief the short pursuit, our current pursuit policy as well as quickly evolving incidents with all personnel." Other than that, he "recommend[ed] no further action." In response to another officer's comments, he further stated that although the pursuit was "lawful" with "no violations noted," he had met with Chazarreta "on at least three different

15

occasions to check on his well being and to discuss the pros and cons to continuing or terminating pursuits in the future." Criado explained that he told Chazarreta to "always weigh the risk involved when making a determination on continuing pursuits and if unsure of details to terminate the pursuit in the future. Also, Captain Krouse was instructed to meet with all current Sergeants/Lt's in order to discuss the same." He then concluded, "I recommend no further action."

Alldredge concurred, stating that "this pursuit was within our policies and procedures." He further stated, "One thing that stood out to me during this review is that I believe the outcome would have been the same even if Sergeant Chazarreta would have discontinued the pursuit at 28th Street" given that Young's truck "was travelling at a very high rate of speed and had no intention of slowing down even though there was 1.5-2 block distance between the suspect and police vehicle." He nevertheless concurred with the other reviewers about "the additional training and meetings the chain of command had not only with Sergeant Chazarreta but with all supervisors. . . . Besides the above listed corrective actions, I recommend no further action for this incident." Sergeant Gomez, who wrote the report that was forwarded to the chain of command, stated that because the pursuit was over so quickly, not knowing who the people were, or what crimes had just been committed "coupled with the stress and adrenaline dumps that Sergeant Chazaretta was experiencing because he was the lead unit," he did not believe that Chazaretta had sufficient time to decide whether the pursuit should be terminated.

The incident-detail report provided the incident location, identified which officers arrived at the scene and when, and described the incident's "problem" as a "traffic violation." The report included some comments from officers who responded to the scene, including one who described smelling alcohol on Young's breath and person.

In April 2019, the police chief approved revisions to the general orders governing vehicle pursuits. Not all changed sections were implicated by the pursuit in this case. Of relevance to the Mezas' arguments on appeal, the policy now states that a traffic violation does not justify a pursuit, and neither does suspicion that a vehicle is stolen. To the section stating that a pursuit must end if the suspect's identity has been determined and later apprehension is feasible was added the parenthetical "(i.e., license plate has a valid return)."[10] The revised version still states that a pursuit may be justified "if the officer reasonably believes that the suspect, if allowed to flee, would present a danger to human life or cause serious injury."

In his deposition, Alldredge discounted the idea that the crash prompted the policy change. He said the change did not go into effect until October 2019 and opined

_____

[10]Even in that case, however, a pursuit could be authorized if the person being pursued is fleeing from a violent felony.

17

that the change would have become effective sooner if the crash had been its impetus.[11] He further explained that he had been a part of revising the policy and that the department had been discussing updating the policy even before the pursuit happened.

The Mezas' expert pointed out that Chazarreta's pursuit decision was based on assumptions rather than facts and that he never bothered to confirm whether his assumptions were correct. The expert opined that Chazaretta's actions in initiating and continuing the pursuit and in driving as he did in a 30-mph zone were so unreasonable and dangerous that no reasonable police officer would have taken them.

## IV. Insufficient Evidence of Notice

The City's awareness that the crash happened during a police pursuit is not enough to show subjective awareness. *See Tenorio*, 543 S.W.3d at 778. The Mezas argue, however, that the evidence shows more than that; they argue that the evidence at least raises a fact issue about whether the City was aware that the pursuit should not have occurred. We disagree, but even if the evidence did raise a fact issue about whether the pursuit was against policy, that alone is not enough to show that the City knew it was at fault in the manner the Mezas alleged. To show actual notice, the evidence must raise a fact issue about whether the City was aware that the pursuit was at least part of what

---

[11]The revision was approved by the police chief on April 24, 2019 and states that it "shall be effective immediately," but Alldredge was not asked about the discrepancy between that language and his testimony that it went into effect in October.

led Young—the person whose vehicle actually struck the Mezas' Jeep—to drive in the manner and direction that he did. The evidence does not raise such a fact issue.

Even before the traffic stop, Young showed his willingness to disregard traffic laws when he ran a red light. Then, to flee Wright's stop, he drove on the wrong side of the road, drove the wrong way on an exit ramp to turn onto North Main, and then began speeding down North Main—in the direction of the North Main–Exchange intersection at which he would hit the Mezas' Jeep—all before Chazaretta's pursuit even began. Young's driving was, in fact, partially why Chazaretta pursued him. There is no evidence to show that the City believed that Young would have stopped speeding and violating traffic laws or would have driven in a different direction if the pursuit had not been initiated or had been terminated earlier. Although the Mezas argue that the pursuit report "demonstrates a subjective understanding that the [department]'s conduct related to this crash could subject the City to liability," the report does not reflect such an understanding. The only related evidence is Alldredge's stated belief that Young "had no intention of slowing down" and that if the pursuit had terminated at 28th Street, the crash still would have happened.[12] Thus, to the extent that the chain of command even

---

[12]Our opinion should not be construed as holding that a plaintiff can never show actual notice when the governmental unit has included in an investigation report a self-serving statement absolving it of fault. Other jurisdictional evidence may show that the governmental unit actually knew about its potential responsibility and thereby create a fact issue on the question. But the record here simply does not show the City had the requisite knowledge.

considered the City's fault in the crash, Alldredge concluded that the pursuit was *not* a cause. We therefore cannot say that the pursuit report raises a fact issue about whether the City had subjective awareness that, as the Mezas alleged in their petition, the crash occurred because of the pursuit. If the police department's chain of command secretly concluded that the pursuit violated policies and that the pursuit contributed to the accident, nothing in the record reveals that fact.

The Mezas contend, however, that the pursuit report shows subjective awareness through the use of the phrase "corrective actions" to describe the recommendation that personnel be reminded about the department's policy on pursuits. The Mezas direct us to (a) the report sections in which Criado wrote that he "believe[d] this is a good opportunity to debrief the short pursuit, our current pursuit policy as well as quickly evolving incidents with all personnel," that he met with Chazarreta and apprised him "to always weigh the risk involved when making a determination on continuing pursuits and if unsure of details to terminate the pursuit in the future," and that he instructed another officer "to meet with all current Sergeants/Lts in order to discuss the same"; and to (b) Alldredge's statement in the report that he "agree[d] with the additional training and meetings the chain of command had not only with Sergeant Chazarreta, but with all supervisors in the Division," that "Supervisors must always weigh the risk versus reward, know the population density of specific areas and vehicular/pedestrian traffic in the area," and that, "[b]esides the above listed corrective actions, [he] recommend[ed] no further actions for this incident." The Mezas assert that "[t]hese

20

comments, all written within 2 months of the Crash, indicate the City's intention to take 'corrective actions' after and because of this pursuit and crash." In other words, the Mezas interpret the "corrective actions" wording to mean that Criado and Alldredge had concluded that Chazarreta's pursuit was a policy violation for which corrective action had to be taken. They further argue that "[t]he purpose of the [notice] statute—to enable governmental units to gather information—was fulfilled," and that the City therefore received the notice to which it was entitled, because although "the existence of the investigation by itself is not necessarily dispositive of notice, the conclusion that the involved officer needed remedial or refresher training indicates potential responsibility on behalf of the governmental unit that can and often does create a fact issue of actual notice."

But what these report sections do not show is the City's awareness that it was the pursuit that caused Young to drive recklessly toward the Mesas' Jeep.[13] Nothing in the report shows an awareness that the pursuit contributed to the crash, even if the pursuit did violate policy.[14] *See Town of Highland Park v. McCullers*, No. 05-19-01431-CV,

---

[13]To the extent the Mezas' petition can be read to allege that Chazarreta's high-speed driving contributed to the accident regardless of whether the pursuit had any effect on Young's driving, there is no evidence that the City believed it was at fault in that manner.

[14]Further, we do not agree that the phrase "corrective actions" or the chain of command's recommendation that officers be reminded of the pursuit policy indicates a finding that the pursuit violated policy. Those statements must be read in context with the rest of Criado's and Alldredge's conclusions, including their express determination

21

2021 WL 2766390, at *9 (Tex. App.—Dallas June 29, 2021, no pet.) (noting that the town made no statements attributing a police officer's death or injuries to the town's conduct or omission). Although in another case it might be obvious that a pursuit prompted a suspect's reckless driving, that is not the case here, given Young's prepursuit driving.

Regarding the Mezas' argument that the pursuit actually did violate department policy regardless of what the department believed—essentially arguing that the department *should have* known that the pursuit was wrongful—even if the Mezas are correct, the evidence still does not show subjective awareness. What a governmental unit should have known is not the proper inquiry for actual notice. *Worsdale*, 578 S.W.3d at 63–64.

The Mezas also rely on the fact that the pursuit policy changed after the incident. The Mezas are correct that subsequent remedial measures can be evidence of subjective awareness. *See id.* at 68; *see also City of El Paso v. Lopez*, 594 S.W.3d 715, 720–21 (Tex. App.—El Paso 2019, no pet.) (holding that, in a case in which the city investigated, determined that road conditions were contributing factors to the incident, and then remediated the hazardous road conditions, the city's remediating actions demonstrated

_____

that the pursuit did not violate the policy. The general tone of the report reflects Alldredge's affidavit statement that his using the phrase "corrective actions" "should not be construed to indicate a belief or even a suspicion that Sergeant Chazarreta did anything wrong or that the decisions or actions of any Department personnel were somehow at fault for the traffic accident that ultimately occurred."

22

an actual anticipation of the appellee's claim). The Mezas also point out that the department's incident-detail report describes the incident "problem" as a "traffic violation" and that under the revised pursuit policy, pursuits are not authorized for traffic violations alone.

But the policy change here does not show that the department believed that the pursuit was wrongful or that it contributed to the crash. The evidence regarding Chazarreta's motivation in pursuing Young was that he believed that Young was a burglary suspect and that Young's driving not only violated traffic laws but constituted a danger to the public, and thus Chazarreta's pursuit would not have violated a policy that prohibited pursuits based solely on traffic violations. In other words, as with the other record evidence, the policy change is not enough to show subjective awareness of fault, even if the evidence suggests that the department *should have* concluded that the pursuit violated policy or contributed to the accident. *See Doe v. City of Dallas*, No. 05-18-00771-CV, 2019 WL 2559755, at *3 (Tex. App.—Dallas June 21, 2019, pet. denied) (mem. op.) ("Whether the cumulative evidence at least implies the City was responsible for the injury is not [the] inquiry we make.").

The Mezas also argue that the City "ignores the fact that their own police investigation concluded that 'fleeing or evading arrest' was one of the factors that caused the accident." The Mezas cite the crash report's statement that Young had been charged with "evading arrest/detention causing death." We disagree that this report statement indicates that the department found that a wrongful pursuit by Chazarreta

23

was a cause of the crash. Young undisputedly sped and violated traffic laws to evade arrest or detention *by Wright*, but nothing shows that the department believed that Young was driving as he did down North Main because Chazarreta was pursuing him[15] in violation of department policy.

In summary, we do not determine whether it was reasonable for the City to conclude that the pursuit did not violate policy, and neither do we determine whether the evidence supports a belief that Young would not have driven the way he did without the pursuit. Instead, the relevant inquiry is whether the City either had information that led it to believe that a pursuit that violated department policy was potentially the cause, or at least *a* cause, of Young's driving or knew that the Mezas believed that to be the case, such that the City could anticipate the Mezas' filing suit. The only evidence in the record about the City's belief on that point was that the department had concluded that the pursuit was within policy guidelines and that Alldredge believed that the pursuit did not cause Young to drive recklessly into the Exchange intersection. No evidence suggests that the City had subjective awareness that the pursuit contributed to Young's

---

[15]The only evidence explicitly mentioning whether Young even knew that he was being pursued was Chazarreta's deposition testimony in which he agreed that he did not know what would have happened if he had backed off earlier in the pursuit but then stated that he did not know if Young "knew [he] was behind him [because he] was so far back. . . . And [Young] may have been running just to run."

decision to drive as he did or to the crash.[16] *See Tenorio*, 543 S.W.3d at 778 ("[N]othing in the crash report, witness statements, or case report indicate, either expressly or impliedly, that the [police department] subjectively believed its officers acted in error by initiating or continuing the pursuit such that they were in some manner responsible for the injuries."); *Ortegren*, 2006 WL 495387, at *5 (holding that the subjective-knowledge standard was not met regardless of whether the government's investigator should have reached a different conclusion about the cause of the incident). Consequently, the record does not raise a fact issue about whether the City had subjective awareness of fault and therefore does not raise a fact issue about whether the City had actual notice.

Because the City did not have formal or actual notice of the Mezas' claims, the trial court did not have jurisdiction over the claims. We overrule the Mezas' second issue. Because the second issue is dispositive, we do not reach their remaining issues.

### Conclusion

Having overruled the Mezas' second issue, which is dispositive, we affirm the trial court's dismissal order.

---

[16]Actual notice does not require the government to unconditionally confess fault. *Arancibia*, 324 S.W.3d at 550. Thus, determining that the City had actual notice here would not require the City to have expressly admitted that the pursuit was wrongful and was the cause of Young's dangerous driving and of the crash. But there must be some indication in the record that the City had determined that it was at least potentially at fault. We do not have any evidence of that here.

25

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  March 3, 2022